AIR COMPRESSOR EQUIPMENT *v.*
Arvid Eugene SWORD

CA 99-922                                                          11 S.W.3d 1

Court of Appeals of Arkansas
Division IV
Opinion delivered February 23, 2000

*Anderson, Murphy & Hopkins, L.L.P.,* by: *Randy P. Murphy* and *Scott Provencher,* for appellants.

*Nolan, Caddell & Reynolds, P.A.,* by: *Bennett S. Nolan,* for appellee.

JOHN B. ROBBINS, Chief Judge. In this appeal from an award of benefits by the Workers' Compensation Commission, appellant Air Compressor Equipment Company appeals the award of (1) eleven weeks of permanent partial disability benefits for the loss of appellee's toe, and (2) the costs of fitting, and training appellee to use, a myoelectric prosthetic device for his right hand. Appellee cross-appeals the denial of his request for travel expenses associated with his rehabilitative college education. We affirm on direct appeal and reverse and remand on cross-appeal.

Appellee Arvid Sword worked for Air Compressor Equipment Company as a service technician. On September 20, 1996, he sustained an admittedly compensable injury when he was working on a large air compressor at the Whirlpool Corporation in Fort Smith, Arkansas. A piston inside the compressor fired in such a manner that his right hand was severely injured, amputating all fingers and the thumb, essentially leaving only a small portion of the hand past the wrist. He was right-hand dominant. After emergency surgery to clean and repair the remaining bone and tissue, his plastic and reconstructive surgeon recommended using one toe from each of his feet to reconstruct two functioning digits on the stump of his right hand, thus eliminating the need for a prosthetic device. The surgeon stated that this kind of reconstructive surgery had a ninety to ninety-five percent success rate. Appellee consented to the surgery, and appellant agreed to pay for the surgery. The surgery was unsuccessful because the first attached toe necrosed due to lack of blood circulation and had to be removed. Appellee was left with a

stump without use. Because the surgeon did remove one toe of his left foot in the first step of this reconstructive effort, appellee requested compensation for the loss of his toe. Appellee also requested that his employer pay for a myoelectric prosthesis, as opposed to a conventional hook prosthesis. It was mutually agreed that appellee would not be able to return to manual labor and that appellee desired to enter college in order to become a high school mathematics teacher. Appellee entered a written agreement with appellant in which appellant agreed to pay for this education for two semesters but did not agree to pay for appellee's mileage costs.

Appellant paid all related medical bills, temporary total disability, permanent partial disability benefits, and the cost of two semesters of classes as Arkansas Tech University. Appellant controverted the claim as to (1) the myoelectric prosthetic device, (2) scheduled benefits for the lost toe, and (3) mileage costs for appellee's travel to and from the university. The administrative law judge and the Commission found that the loss of the toe was a compensable consequence of his work-related injury and that the myoelectric prosthesis was reasonably necessary medical treatment. The administrative law judge found that the mileage was compensable, but the Commission did not. Before us now are appellant's appeal of the awards of scheduled benefits for the lost toe and the myoelectric prosthetic device, and appellee's cross-appeal of the denial of mileage costs.

■ In reviewing the Commission's decision on a question of fact, we will affirm the Commission if its decision is supported by substantial evidence; substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Branscum v. RNR Constr. Co.*, 60 Ark. App. 116, 959 S.W.2d 429 (1998). The evidence is viewed in the light most favorable to the findings of the Commission and is given its strongest probative value in favor of the Commission's decision. *Barrett v. Arkansas Rehabilitation Servs.*, 10 Ark. App. 102, 661 S.W.2d 439 (1983). The question is not whether the appellate court might have reached a different conclusion from the one found by the Commission if it were reviewing the case de novo, or even whether the evidence would have supported a contrary finding. *Tyson Foods, Inc. v. Disheroon*, 26 Ark. App. 145, 761 S.W.2d 617 (1988). The Commission's decision should not be reversed unless it is clear that fair-minded persons could not have reached the same conclusions if presented

with the same facts. *Johnson v. Democrat Printing and Lithograph*, 57 Ark. App. 274, 944 S.W.2d 138 (1997).

Appellant agrees that appellee is entitled to a prosthesis but disagrees that it should have to pay for the more costly and sophisticated one. A myoelectric prosthesis is more convenient and has better function than a traditional hook prosthesis. The more sophisticated functions include pinchers that would allow the user some dexterity based upon electric signals from his forearm muscles; less bulk in that it is attached only to the arm itself; and it can be used with variable grip strength. The conventional hook could only be opened and closed by conscious shrugging of the shoulders; would be limited in the body positions that would allow opening and closing of the hook; and is bulkier and requires a body harness to keep it in place. The conventional hook could not be opened or closed if appellee was reaching overhead or to the back and could only be used with an invariable grip force. In short, the myoelectric prosthesis would give appellee substantially greater control and would be much easier to utilize than the conventional hook.

The cost difference is significant. A prosthetic orthotist testified that, according to the "real world" fee schedules, one could expect the price of a myoelectric prosthesis to cost about $18,428, whereas a conventional prosthesis would cost about $4,596. The reconstructive surgeon disagreed with those figures, stating that a myoelectric prosthesis would cost between $10,000-$15,000. The Commission had before it the letter of appellee's surgeon, who stated that appellee "would be best fitted with a neuro electric device, as it is more functional, and this gentleman will require the dexterity of this device" and "this myoelectric device will be best suited for his future needs." His surgeon went further, stating that not allowing him the myoelectric prosthesis was "totally unacceptable."

■ Employers must provide medical services, including artificial limbs, that are reasonably necessary for treatment of compensable injuries. Ark. Code Ann. § 11-9-508(a) (Repl. 1996). Whether a medical procedure or device is reasonable and necessary treatment is a question of fact to be decided by the Commission. *Arkansas Dep't of Correction v. Holybee*, 46 Ark. App. 232, 878 S.W.2d 420 (1994); *Deboard v. Colson Co.*, 20 Ark. App. 166, 725 S.W.2d 857 (1987); *Wright Contracting Co. v. Randall*, 12 Ark. App. 358, 676

S.W.2d 750 (1984). Given the testimonies of appellee's plastic and reconstructive surgeon and the board-certified prosthetic orthotist, there was substantial evidence to support the finding that the myoelectric prosthesis was reasonably necessary to restore appellee as far as practicable to his physical condition before this work-related injury. *See Crain-Burton Ford Co. v. Rogers*, 12 Ark. App. 246, 674 S.W.2d 944 (1984).

■ While there is evidence that appellee could still become a secondary school math teacher with a less costly conventional prosthesis, it is undisputed that the more advanced myoelectric one would more closely restore appellee to his physical condition that existed before being injured at work. The prosthetic orthotist did testify that he had previously fitted another man who was a school teacher with a conventional prosthetic and that he could perform his teaching functions well with it. However, he also testified that the myoelectric prosthesis was unavailable at that time and that the school teacher obtained a myoelectric one when they became available. There is no doubt that with time the current prosthetic devices will improve over what is available today. We cannot say that an employee who sustains a compensable injury must be given the least expensive form of artificial limb or that the Commission errs if it does not so find. We simply hold that there is substantial evidence to support the Commission's award, even under the strict construction of the law that we are required to apply.

■ Appellant next argues that there is no substantial evidence to support an award for eleven weeks of scheduled benefits for the amputated toe. We disagree. If an injury is compensable, then every natural consequence of that injury is also compensable. *Hubley v. Best Western Governor's Inn*, 52 Ark. App. 226, 916 S.W.2d 143 (1996). The basic test is whether there is a causal connection between the two episodes. *Jeter v. B.R. McGinty Mechanical*, 62 Ark. App. 53, 968 S.W.2d 645 (1998); *Bearden Lumber Co. v. Bond*, 7 Ark. App. 65, 644 S.W.2d 321 (1983). This is true even for injuries resulting from medical treatment according to 82 Am.Jur.2d, *Workers' Compensation* § 371 (1992), entitled "Injury or aggravation resulting from medical treatment or failure to furnish an adequate treatment," wherein it states:

> As a general rule, an injured employee may recover compensation for a new injury, or an aggravation of his injury, where there is no

intervening independent cause to break the chain of causation between the new injury, or aggravation, and the original injury.

■ Whether there is a causal connection is a question of fact for the Commission. *Jeter, supra.* Appellee's surgeon testified that the success rate on toes-to-hand surgery is ninety to ninety-five percent. Had the reconstruction been successful, a prosthetic device would not have been required. Appellant maintains that this was an elective procedure and that the loss of the toe was not a compensable consequence of his work injury. This defies reason because appellant agreed to pay for the surgery as a compensable consequence of the work injury. There would not have been a need for such surgery but for the admittedly compensable work injury.

Appellant cites *Swoffer v. Marmac Industries, Inc.*, 43 Mich. App. 543, 204 N.W.2d 344 (1972), for the proposition that an employer is not responsible for loss of a digit when that loss is occasioned by elective reconstructive surgery following a work-related injury. In short, the Michigan Court of Appeals held that an employer did not have to compensate for the removal of a sound digit when that removal is used to reconstruct a damaged digit because it forced the employer to pay for an injury not occurring at work. We are not persuaded by Michigan's position in this instance.

■■ This court has applied the concept of "quasi-course of employment" to compensate employees for injuries resulting from activities undertaken by the employee after a compensable injury that, though they occur outside the time and space limits of the workplace, are nevertheless related to the employment in the sense that they are necessary or reasonable activities undertaken only because of the compensable injury. *Eagle Safe Corp. v. Egan*, 39 Ark. App. 79, 842 S.W.2d 438 (1992). There is substantial evidence to support the finding that the toe amputation was causally connected to his compensable injury.

Appellee cross-appeals the finding that he is not entitled to mileage costs from his employer for commuting to and from Arkansas Tech University. The parties entered into a written rehabilitation agreement whereby appellant would pay for certain costs associated with that plan, and it expressly excluded mileage costs. Appellee requested those benefits, and the administrative law judge granted them. On appeal, the Commission reversed, finding that appellee

waived those benefits. We hold that appellee should be awarded those mileage benefits and reverse on this point.

The pertinent statute, Ark. Code Ann. § 11-9-505(b)(1) (Repl. 1996) provides:

> In addition to benefits otherwise provided for by this chapter, an employee who is entitled to receive compensation benefits for permanent disability and who has not been offered an opportunity to return to work and/or reemployment assistance *shall be paid reasonable expenses of travel* and maintenance and other necessary costs of a program of vocational rehabilitation if the commission finds that the program is reasonable in relation to the disability sustained by the employee.

(Emphasis added.)

■ The agreement between the parties amounted to a contractual agreement limiting the benefits that appellee was otherwise entitled to receive under workers' compensation law. This contractual agreement is invalidated by statute, Ark. Code Ann. § 11-9-108 (Repl. 1996), which states:

> No agreement by an employee to waive his right to compensation shall be valid, and no contract, regulation, or device whatsoever shall operate to relieve the employer or carrier, in whole *or in part, from any liability* created by this chapter, except as specifically provided elsewhere in this chapter.

(Emphasis added.) This statutory provision is clear and unambiguous. Therefore, any contractual agreement could not operate to eliminate reasonable travel expenses from appellee's rehabilitation plan.

We affirm on direct appeal; on cross-appeal we reverse and remand to the Commission with directions that it award reasonable travel expenses to appellee.

STROUD and ROAF, JJ., agree.